## Thurman v. Commonwealth.

### (Decided February 17, 1911.)

#### Appeal from Bell Circuit Court.

1. Continuance—Diligence.—In the absence of diligence shown for a continuance, it is not error to try an accused person at the the same term at which he was indicted.

2. Misconduct of Bystander.—The misconduct of a bystander in shaking hands with and speaking to the jurors, during a recess of the court, and urging them to "give him the fair deal, give him

justice," was not prejudicial to the accused—the court having promptly rebuked the offender in the presence of the jury.

3. Instructions.—When the instructions gave the law as to murder, voluntary manslaughter, killing in sudden heat and passion, and the right of self-defense, accompanied with a proper definition of malice, and the usual instruction to acquit in case of reasonable doubt of guilt, it was unnecessary, under the facts of this case, to give a further instruction defining appellant's rights in case he acted under a provocation which was necessarily calculated to excite his passion beyond the power of self control.

O. V. RILEY, E. N. INGRAM and J. G. ROLLINS for appellant.

JAMES BREATHITT, Attorney General and TOM B. McGREGOR Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE MILLER—Affirming.

On September 26th, 1910, appellant Thurman shot and killed Sam Johnson. Thurman was indicted the next day for wilful murder, and his trial set for October 5th. When the case was called on October 6th it was reassigned to October 19th for trial, and it was then tried. The jury found appellant guilty and fixed his punishment at confinement in the penitentiary for life.

The tragedy occurred in a gambling house conducted by the deceased in Middlesboro, on a Sunday about midnight or shortly thereafter. Johnson and Thurman, with several other friends of Johnson, had assembled in the latter's room for the purpose of gambling. They had been gambling several hours, and Thurman, evidently being in bad humor by reason of his losses, tore the cards and threw them on the floor. The cards belonged to Johnson, and he remonstrated with Thurman, at the same time calling him a vile name; and according to some of the witnesses Johnson started towards Thurman in a menacing manner. Thurman says he pushed Johnson back with his hand to keep him off of him, while some of the other witnesses say Thurman slapped Johnson in the face. Thurman attempted to leave the room, but, in his haste, he stumbled and fell to the floor; whereupon Johnson, who was pursuing him, cut Thurman severely in the back. Friends immediately interfered, one of them holding Johnson in the room, while others carried Thurman down the steps into the yard. Thurman's pistol had been lying upon a bed in the room during the game, and when the fight occurred Alex-

ander, one of the men who escorted Thurman down the steps, procured the pistol in some way and carried it with him into the yard. Thurman knew Alexander had the pistol, and demanded that he give it up. This Alexander refused to do, for fear Thurman would injure some one; but Thurman drew his knife, and, threatening to cut Alexander's throat, Alexander gave him the pistol; Thurman saying at the time that he would kill the man who had cut him. When Thurman recovered the pistol he pointed it towards the second-story window of Johnson' room,    evidently for the purpose of firing at Johnson if he could see him; but, as Johnson remained out of sight, Thurman forced open the lower door at the bottom of the steps, bounded up the stairs, and either forced open the door at the top of the stairs, or found it open with Johnson standing directly in the opening. A pistol shot was heard, and when those in the back yard went to the scene they found Johnson stretched upon the floor with a bullet hole through his forehead. He died within a few minutes thereafter. Thurman testified that Johnson struck him with a shovel when he entered the door at the top of the stairs, and that he shot Johnson in self-defense and to prevent the latter from killing him with the shovel. Some of the witnesses testified that a spade or a shovel was found lying on the floor some three or four feet away, while a majority of the witnesses testified that there was a shovel resting against the wall some distance away.

The court instructed the jury upon the law as to murder, voluntary manslaughter, and the right of self-defense. The court also defined malice, and gave the usual instruction as to reasonable doubt. No objection is taken to the instructions that were given. It is insisted however, that the judgment should be reversed upon any one of three grounds, namely (1) that the court erred in refusing to continue the case on the showing made by appellant in his affidavit; (2) that the court should have discharged the jury for the misconduct of a bystander who talked with several of the jurors during the trial; and (3) that the court did not give all the law of the case.

When the case was called for trial on October 17th the appellant moved the court for a continuance, and, in support of his motion, filed his own affidavit to the effect that he had been confined in jail ever since the killing of Johnson, and that for that reason he had had

no opportunity to make sufficient preparation for his defense. By way of specification he stated that there were a number of other men in the yard back of the saloon when the killing occurred, but that he did not know the names of any of them, and had not had time to find out who they were, except that one of them was named Smith, whose home was in Harlan county, Kentucky; that Smith would truthfully state, under oath, that he was in the back yard at the time of the killing and that just before the shot was fired Smith saw Thurman and Johnson through the window, and that Johnson had a dirt shovel in his hand raised as if to strike Thurman, who shot Johnson as the shovel came down upon Thurman. Clearly the affidavit did not show a case of diligence on the part of appellant that would require the court to grant him a continuance. The discretion lodged with the trial court in continuing a criminal case is covered by sections 188 and 189 of the Criminal Code of Practice, and this court has uniformly held that, unless it appears that the trial court abused its discretion in declining to continue the trial of a criminal case, it will not set aside a judgment of conviction for that reason. We do not think there was any abuse of discretion in this case. All the witnesses who were present at the killing appeared and testified on one side or the other, and there is nothing shown in the evidence to justify even a pretence that any other persons were in the back yard of the saloon, or knew anything about the facts of the case, except those who had been in the room and who testified. The killing occurred after midnight, when it was extremely improbable that any persons other than those present in the room would have known anything about it; and if any others had been present, the witnesses would have known it. No one of them corroborates appellant in the slightest degree, in this respect.

During the progress of the trial, Sam Walden, a colored man, came into the court room before the session of the court had opened, but while the jury was in the box, the judge on the bench, and the attorneys for the appellant and appellee were present, and began to shake hands with the jurors, and to say to each, as he shook hands with him, "give him the fair deal, give him justice." Before Walden had shaken hands with all of the jurors, he was admonished by the court, in the presence of the jury, and stopped by the sheriff from further communication with the jurors; whereupon Walden took his

seat near appellant and his counsel. Counsel for appellant moved the court to withdraw the case from the jury and to discharge it, because of the conduct of Waldon; but the court overruled the motion. It is claimed that this unusual conduct of Waldon prejudiced the appellant with the jury. Thurman and Johnson, as well as Waldon, were colored men. At most, the expression used by Waldon is of doubtful meaning and application; it is difficult to say whether it was meant to favor Thurman, or to injure him in the eyes of the jury. At any rate, he was promptly rebuked by the judge, and we do not see that Waldon's act in any way prejudiced the appellant. From the fact that Waldon took a seat near appellant and his counsel, it would seem that he was a friend of Thurman, and had intended by his action to befriend him. No other fact has been developed in connection with this incident that would even tend to show that Waldon's action had been detrimental to the rights of Thurman. We conclude that the Circuit Court properly declined to discharge the jury.

In the second instruction the jury were told that, if the defendant " in sudden heat and passion or in sudden affray, and without previous malice, and not in his necessary, or reasonably apparent necessary self-defense, so shot and wounded Sam Johnson, as that he then and there died thereby, then the defendant is guilty of voluntary manslaughter, included in the indictment herein, and you ought to so find." It is insisted that the court should have enlarged this instruction by incorporating in it the idea that, if Thurman acted upon some provocation which was reasonably calculated to excite his passions beyond the power of self control, they should not find him guilty of murder, but should find him guilty of voluntary manslaughter, as provided in said instruction. We are of opinion that the instruction as given covered the case under the evidence. Thurman had left the house where the difficulty started; had gone downstairs into the yard where he had another altercation with Alexander over the pistol, and had then gone back upstairs and renewed the difficulty with Johnson. In giving the instruction covering the effect of appellant's acts if done in sudden heat and passion, and without previous malice, and in his necessary self-defense, we are of opinion that his case was fully and fairly presented to the jury.

The judgment is affirmed.